# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

JUSTIN PAUL FARNSWORTH,

   Petitioner,

v.

JOHN F. KING, Warden,

   Respondent.

Civil No. 09-333 (RHK/JJK)

**REPORT AND RECOMMENDATION**

---

  Mark D. Nyvold, 332 Minnesota Street, Suite W-1610, St. Paul, Minnesota, 55101, for Petitioner.

  Scott A. Hersey, Assistant Dakota County Attorney, Dakota County Judicial Center, 1560 Highway 55, Hastings, Minnesota, 55033, for Respondent.

---

JEFFREY J. KEYES, United States Magistrate Judge

  This matter is before the undersigned Magistrate Judge of the District Court on the petition of Justin Paul Farnsworth for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a response, (Docket Nos. 22 and 23), contending that the petition should be dismissed.

  The matter has been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court will recommend that Petitioner's habeas corpus petition be DENIED, and that this action be DISMISSED WITH PREJUDICE.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

In November 2004, Petitioner was living with three young girls. The mother of the three girls was Petitioner's ex-girlfriend, but she was not living with Petitioner and the girls. The two youngest girls were the offspring of Petitioner and his ex-girlfriend, but Petitioner was not the biological father of the oldest of the three girls – a nine-year-old, referred to here as "BP."

On or about November 10, 2004, Petitioner's ex-girlfriend picked up her three daughters at Petitioner's residence. She was informed by a neighbor that her daughter, BP, had said she had been sexually abused by Petitioner. BP's mother reported the matter to the police, and on Friday, November 12, 2004, BP was interviewed by a social worker and a police officer named Schmitz. BP told them that during the previous summer Petitioner had touched her on her private parts with his private parts and engaged in other inappropriate acts, including watching pornographic with BP.

Officer Schmitz "placed a 72-hour hold" into effect, which prevented BP and the two other girls from returning to Petitioner's residence. Schmitz then left a message for Petitioner, stating that he wanted to talk to Petitioner about the status of the children. When Petitioner called the police station during the weekend, Schmitz was not there, but Schmitz eventually reached Petitioner, and Petitioner agreed to come to the station and talk

---

[1] Except as otherwise noted, the Court's summary of the background of this case is based on (1) the criminal complaint filed against Petitioner, (Respondent's Index # 2, Exhibit 19, [Docket No. 26]), (2) the "Findings of Fact" made by state trial court, (Respondent's Index # 2, Exhibit 58, "Findings of Fact, Conclusions of Law and Order," dated January 30, 2006, [Docket No. 26]), and (3) the Minnesota Supreme Court's decision in State v. Farnsworth, 738 N.W. 2d 364, 366-70 (Minn. 2007).

to Schmitz.

When Petitioner arrived at the station on Monday, November 15, 2004, Schmitz was not wearing a police uniform, but he had a badge and a gun with him. The two men went to Schmitz's office, and their conversation was recorded by a hidden video camera, and an audio recorder that was plainly visible. The door of the office was closed, but Petitioner was not otherwise restrained, and Schmitz told him he was not under arrest and he could leave at any time.

Initially, Schmitz asked some general questions about the children who were living with Petitioner, and who cared for them. Petitioner thought Schmitz was concerned about an incident involving possible neglect of one of the two younger girls. During that early part of the interview Petitioner acknowledged that he was a convicted sex offender.

A few minutes into the interview, Schmitz told Petitioner that he wanted to talk about another matter, and he emphasized that he wanted Petitioner to tell the truth. Schmitz then asked Petitioner about inappropriate touching of BP, and Petitioner initially denied the accusation. Schmitz then talked about how people make mistakes and deserve a second chance, and that when a person makes a mistake it is important to admit it. Schmitz said that Petitioner had made a mistake, that he could get some help, and a "judge will work with you."

When Schmitz asked Petitioner whether he had kept pornographic videos at his home, Petitioner acknowledged that he did. Upon further questioning, Petitioner acknowledged that he had watched a pornographic movie with BP. Schmitz continued to talk to Petitioner about getting him some help, and about the importance of being honest. He then asked Petitioner once again whether he had touched BP inappropriately, and this

3

time Petitioner said "yes." When Schmitz asked for more information, Petitioner asked whether he would be going to jail. Schmitz evaded the question, saying "lets do this first," and he then continued to question Petitioner about what he did with BP. Petitioner then made another incriminating statement about touching BP inappropriately. After that admission, Schmitz asked Petitioner whether he had done anything else to BP, and again reminded Petitioner that "honesty is the best thing." Petitioner responded that he was "already going to jail for it." He then talked about how he had been feeling lonely, and that BP's mother had left him in the middle of the night for another man. Schmitz said that he understood that Petitioner was upset, and told Petitioner "this is something we're gonna work through," and "[y]ou're gonna get help." Petitioner then stated "I don't want to lose the kids over it." Schmitz said "[n]o one said you're gonna lose your kids here." Petitioner responded: "I do know. This is bad. This is how they do it." Schmitz repeated, "we don't know that," and added that "[t]hings are gonna be alright." Petitioner rejected that assertion, telling Schmitz "[i]t ain't gonna be alright."

Schmitz then continued to ask Petitioner more questions about what he had done to BP. When Schmitz asked about whether he had engaged in a specific sexual act with BP, Petitioner equivocated, saying he had not, "as far as [he knew,]" and he denied engaging in another specific sexual act with BP. Petitioner said that Schmitz was trying to get "a big list of certain things to put me away to jail." Schmitz denied that accusation, and told Petitioner, "I'm trying to get you the best help I can so you can have your kids still." Petitioner responded: "I want as much help as I can." Schmitz then said: "And you're gonna get it. But you're not gonna get it by sitting here lying." Then Petitioner said: "I'm

not trying to lie.  She says I did it, I did it."[2]

During the remainder of the interview, Petitioner gradually came to admit that he had

engaged in several specific acts with BP.  When Schmitz asked Petitioner why he had

abused BP, Petitioner responded that he thought he was trying to "get back at" BP's

mother.  Petitioner said that he thought he abused BP, rather than his own two daughters,

because BP was not his biological child.  Petitioner also said that he did not threaten BP,

but he did tell her that he was sorry for what he had done to her.

The transcribed portion of the interview ended as follows:

Petitioner:     "I don't think [BP]'s a liar and I'm never gonna
                say that to the Hastings Police.  She's a good
                girl."

Schmitz:        "Okay.  What I'm gonna do is stop this and what
                I want to do with you if it's okay so we don't have
                to type up an hour and ten minutes of b.s., I'm
                gonna shorten it down to about a three minute,
                two minute version of what you stated.  Is that
                okay with you?"

Petitioner:     "That's fine."

Schmitz:        "Okay."

Petitioner:     "Is it gonna be all the bad parts?"

Schmitz:        "We're not gonna hit on anything else, we're just
                gonna say what happened with you and [BP].
                Okay?"

Petitioner:     "Yeah."

─────────────────────

[2]  This portion of the interview is quoted and discussed in both the trial court's
findings of fact, and the Minnesota Supreme Court's synopsis of the facts.  (See n. 1,
supra.)   The entire transcript of the interview is included in the present record at
Respondent's Index # 2, Exhibit 18, (Docket No. 26).  The section of the interview cited in
the text above, (to which this note is appended), is at p. 30 of the transcript.

| Schmitz: | "Is that okay?" |
|---|---|
| Petitioner: | "You got my confession."[3] |

Schmitz then attempted to obtain a formal videotaped statement. However, when he began to ask Petitioner questions about BP, Petitioner refused to respond. Petitioner asked Schmitz to turn off the videorecorder, but Schmitz declined. Petitioner asked whether he was being arrested, and Schmitz said he did not know. Schmitz asked whether Petitioner wanted to give a formal statement, and Petitioner said he needed some time. Petitioner asked what was going to happen, and Schmitz said that Petitioner should complete his statement, and he would then get some help. Petitioner said that he knew that if he made a statement, it could be used against him. Schmitz said that the Petitioner's previously recorded part of the interview also could be used.

Petitioner expressed some misgivings about his previous statements to Schmitz, but Schmitz told Petitioner he had done the right thing. Petitioner asked if he could step outside for a cigarette. Schmitz agreed, and went outside with Petitioner. When they returned to interview room, Petitioner said that he needed "a lawyer or something." Schmitz then excused himself, and when he returned he said that he could not talk to Petitioner any more, because Petitioner had mentioned a lawyer.

Petitioner was taken to a holding cell, and a few minutes later Schmitz arrived there. Petitioner then told Schmitz that he did not want a lawyer, and that he wanted to make a

---

[3] This section of the interview is at p. 46 of the transcript referred to at n. 2, <u>supra</u>. (Respondent's Index # 2, Exhibit 18, [Docket No. 26].)

statement. Schmitz and Petitioner returned to the interview room, and Schmitz turned on the recording equipment. Schmitz then asked Petitioner about BP, and Petitioner denied that he had ever had any sexual contact with BP. When Schmitz asked Petitioner about his previous statements during the earlier interview, Petitioner claimed that he had been coerced. Schmitz then ended the conversation and turned off the recording equipment.

Shortly thereafter, Petitioner talked to a social worker for a few minutes, and Schmitz then arrested him. Schmitz never advised Petitioner of his constitutional rights, as prescribed by the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436 (1966).

Petitioner was charged with three counts of criminal sexual conduct. In Count I, Petitioner was charged with engaging in sexual penetration of a person who was under the age of thirteen and more than 36 months younger than Petitioner. In Count II, Petitioner was charged with engaging in sexual contact with a person who was under the age of thirteen and more than 36 months younger than Petitioner. And in Count III, Petitioner was charged with engaging in multiple acts of sexual penetration with a person under the age of sixteen who had a significant relationship with Petitioner. In all three counts, Petitioner was further charged with committing his offenses within fifteen years after a previous sex offense conviction. Petitioner made his first appearance in court on these charges on November 17, 2004, and at that time a public defender was appointed to represent him.

Petitioner's attorney reviewed a videotape of Petitioner's interview with Schmitz. However, the attorney apparently believed there were no valid legal grounds to suppress the statements Petitioner made during the interview. In any event, the attorney did not file a suppression motion. The attorney ultimately concluded that Petitioner was unlikely to avoid a conviction, and that it would be best to enter a guilty plea and seek a favorable

sentence.

Petitioner apparently had some reservations about pleading guilty, and he discussed the matter with his attorney for two or three hours on the night before he was scheduled to go to trial. Petitioner expressed renewed reservations on the morning of the scheduled trial, and he talked to his attorney for a few more hours. Ultimately, however, Petitioner agreed to plead guilty, and on April 18, 2005, he did plead guilty to Count I of the pending charges. As part of the plea arrangement, Counts II and III were dismissed. Upon entering his guilty plea, Petitioner acknowledged that he was waiving his right to a trial, and various other constitutional rights as well. He further acknowledged that he would be sentenced to a mandatory minimum of twelve years in prison because of his prior sex offense conviction, and that the maximum sentence he could receive would be 30 years. Petitioner also admitted to the elemental factual allegations charged in Count I.[4] Sentencing was deferred.

In August 2005, Petitioner withdrew his previous waiver of his right to a jury trial on sentencing issues. On September 12, 2005, Petitioner filed a motion to withdraw his guilty plea. That motion precipitated the departure of Petitioner's original attorney, and the appointment of new counsel. Petitioner's new lawyer filed an amended motion to withdraw the guilty plea, which raised several arguments, most notably, that Petitioner had not been adequately informed that he could challenge the admissibility of his statements to Officer

---

[4] A transcript of the guilty plea hearing on April 18, 2005, is included in the present record at Respondent's Index # 1, (Docket No. 26).

Schmitz.  A hearing on the motion to withdraw was conducted in November 2005.[5]

The trial court did not immediately rule on Petitioner's motion to withdraw his guilty plea, but instead granted Petitioner an opportunity to challenge the admissibility of his statements to Schmitz.  (See Respondent's Index # 2, Exhibit 52, Order dated December 5, 2005, [Docket No. 26].)   Petitioner subsequently filed a motion to suppress his confession, and an evidentiary hearing on that motion was conducted on January 5, 2006.[6] A few weeks after that hearing, the trial court entered an order that included two "conclusions of law":

> "1.  Portions of the Defendant's confession were obtained through coercion.
>
> 2.  Because portions of the Defendant's confession were suppressible, it would be fair and just to allow him to withdraw his guilty plea."

(Respondent's Index # 2, Exhibit 58, Order dated January 30, 2006, [Docket No. 26].)[7]

---

[5]  A transcript of the motion hearing, which was held on November 10, 2005, is included in the present record at Respondent's Index # 1, (Docket No. 26).

[6]  A transcript of the evidentiary hearing on the suppression motion, on January 5, 2006, is included in the present record at Respondent Index # 1, (Docket No. 26).

[7]  The Minnesota Supreme Court summarized the trial court's analysis as follows:

"The district court... expressed concern about Schmitz's later offer of help in which he claimed that he was not trying to put [Petitioner] in jail but rather was 'trying to get [Petitioner] the best help [he could] so [Petitioner] can have [his] kids still.'  The court noted that '[t]his statement could clearly be perceived as a promise that if the Defendant cooperated he could get help and have his kids.'  The court noted that after Schmitz made this offer of help, [Petitioner] stated that he was not trying to lie and then stated, 'She says I did it, I did it.'  The court concluded that, under the circumstances, [Petitioner's] comment that he did whatever B.P. said he did, without full knowledge of B.P.'s accusations, 'was consistent with an attempt to take advantage of the officer's offer of help' and 'a clear indication that the Defendant was willing to admit to whatever he had to in order to take advantage of the officer's offer of help so that he could get his kids back.'...

Thus, Petitioner's motion to suppress his confession was "granted in part and denied in part," and his motion to withdraw his guilty plea was granted. (Id.)  The parties were directed to contact the Court to make arrangements for a trial date.  However, the case did not proceed to trial, because the State appealed the trial court's order setting aside the guilty plea.

On appeal, the Minnesota Court of Appeals determined that Petitioner had waived his right to challenge the admissibility of his confession by entering his guilty plea.  The Court explained its analysis as follows:

> "[Petitioner] claimed that he was entitled to withdraw his plea because he was not 'fully apprised' of the issues relating to his confession and of the potential challenges that could have been made to that confession, particularly the challenges to the officer's statements that he was not trying to put [Petitioner] away but was trying to obtain treatment for [Petitioner] and that he did not know if [Petitioner] would have to go to jail and lose his kids.  [Petitioner] argued that '[n]ot being made aware of the issues that existed in connection with his statement made the waiver of this suppression issue involuntary and likewise made [Petitioner's] plea unknowing and unintelligent.'...

> [A]t the plea hearing, [Petitioner] specifically acknowledged that he could have a hearing to 'test the constitutional admissibility of certain evidence' prior to trial and that he understood that by pleading guilty he was giving up that right.  The record thus establishes that [Petitioner] entered into a counseled plea, that he understood his rights, and that he voluntarily waived those rights.

> _____

> [Footnote omitted.]  Concluding that even an innocent man might have done the same thing, the court determined that everything Petitioner said after Schmitz made the later offer of help was obtained through coercion and was suppressible.  Further, because that portion of [Petitioner's] confession was involuntary, the court determined that it was fair and just to allow [Petitioner] to withdraw his guilty plea."

State v. Farnsworth, 738 N.W.2d 364, 370 (Minn. 2007).

> Under the circumstances, the district court abused its discretion when
> it allowed [Petitioner] to withdraw his guilty plea."

State v. Farnsworth, No. A06-258 (Minn.App. 2006), 2006 WL 2556703 (unpublished opinion) at ** 2 -3. Thus, the Court of Appeals concluded that Petitioner's guilty plea should remain in effect.

Petitioner asked the Minnesota Supreme Court to review the Court of Appeals' decision, and that request was granted. On September 13, 2007, the State Supreme Court issued a lengthy published opinion, which rejected the Court of Appeals' reasoning, but affirmed its final ruling on other grounds. State v. Farnsworth, 738 N.W.2d 364 (Minn. 2007). The Supreme Court found that Petitioner had not waived his right to challenge the admissibility of his confession by pleading guilty. The Court ruled that Petitioner had "raised concerns about whether his guilty plea was intelligently entered," and it was therefore "proper for the district court to hold a hearing to determine whether a fair and just reason existed to permit withdrawal of [Petitioner's] plea." Id. at 372. The Court concluded that "the court of appeals erred when it failed to consider whether a fair and just reason existed to permit plea withdrawal." Id.

Thus, the Minnesota Supreme Court determined that Petitioner's guilty plea could be withdrawn, if he had demonstrated a "fair and just reason" for allowing him to do so. The Court explained that –

> "In this case, the district court's decision to permit [Petitioner] to withdraw his plea was premised solely on the court's conclusion that [Petitioner's] incriminating statements to the police were inadmissible. Therefore, we must decide whether the court correctly concluded that [Petitioner's] confession was inadmissible. If that conclusion was incorrect, then the court abused its discretion in permitting the withdrawal of [Petitioner's] plea."

Id.

11

The next step in the Supreme Court's analysis was to determine whether Petitioner's confession actually was inadmissible, because it was coerced and involuntary. Id. at 373. The Court pointed out that when the voluntariness of a confession is at issue "'[t]he question in each case is whether the defendant's will was overborne at the time he confessed.'" Id., quoting Lynumn v. Illinois, 372 U.S. 528, 544 (1963). The Court further explained that –

> "We look at the totality of the circumstances to determine whether a confession was voluntary.... [Citation omitted.] Relevant factors include the defendant's age, maturity, intelligence, education, and experience; 'the ability of the defendant to comprehend; the lack of or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; whether the defendant was deprived of any physical needs; and whether the defendant was denied access to friends.'"

Id., quoting State v. Jungbauer, 348 N.W.2d 344, 346 (Minn.1984) (citing State v. Linder, 268 N.W.2d 734, 735 (Minn.1978)).

The Minnesota Supreme Court then applied the foregoing criteria to the trial court's findings of fact regarding Petitioner's confession. The Court concluded that "the nature of the interrogation [by Officer Schmitz] was not so coercive as to render the confession involuntary." Farnsworth, 738 N.W.2d at 374. The Court said:

> "We do not believe that Schmitz's statements, together with the other circumstances surrounding the interview, were so coercive, manipulative, or overpowering as to deprive [Petitioner] of his ability to make an unconstrained and wholly autonomous decision to speak. Schmitz's statements contained no explicit or implied promises. Rather, Schmitz's statement implied that people who commit child sex abuse need and should receive help. The nature of the questioning does not suggest that [Petitioner] was led to believe that Schmitz occupied something other than an adversarial role as a questioner. In fact, [Petitioner's] own statements, indicating that he was going to jail and going to lose custody of his children, illustrate [Petitioner's] understanding of Schmitz's role in the interview."

Id.

12

The Minnesota Supreme Court closed its opinion by stating that "[u]nder the totality of the circumstances, we conclude that [Petitioner's] confession was voluntary and that no fair and just reason exists to permit [Petitioner] to withdraw his plea." Id. at 375. Thus, Petitioner's guilty plea was reinstated, and the case was returned to the trial court for sentencing.

On February 15, 2008, the trial court sentenced Petitioner to 324 months in prison. (Petition, [Docket No. 1], p. 1, § 3.) Petitioner did not file a direct appeal after a final judgment was entered in his case, and he has not pursued any post-conviction relief in the Minnesota state courts. In 2009, Petitioner filed his current petition seeking habeas corpus relief under 28 U.S.C. § 2254.

## II. CLAIMS PRESENTED

Petitioner's current habeas corpus petition presents two grounds for relief. First, Petitioner claims that his guilty plea should be vacated, because it was predicated on a confession that was not given voluntarily, but was induced by duress and coercion. Petitioner contends that Officer Schmitz "used coercive tactics that violated Petitioner's due-process right," including "psychological pressure and promises of no-prison, probation, treatment and keeping [his] children." (Petition, [Docket No. 1], p. 4, § 12.) As discussed above, the Minnesota Supreme Court found that Petitioner's guilty plea could be withdrawn, if his confession was not voluntarily given. That Court ultimately determined, however, that Petitioner could not withdraw his guilty plea, because he could not show that his confession actually was coerced and involuntary. Petitioner now seeks to overturn that ruling. He is asking for a writ of habeas corpus that would quash his confession because it was coerced, and would, concomitantly, vacate his guilty plea.

13

Petitioner secondly contends that his confession should be suppressed, and his guilty plea should be set aside, because he was not given a <u>Miranda</u> warning before he confessed his crimes to Officer Schmitz. Although Petitioner apparently acknowledges that he was not "in custody" when he first went to the police station, he argues that sometime during his interview with Officer Schmitz he effectively became "in custody," and Schmitz then should have read him his <u>Miranda</u> rights. According to Petitioner, once he admitted to "inappropriate sexual conduct," (presumably meaning that he was touching BP's bottom while masturbating), "it was objectively apparent that a reasonable person in Petitioner's position would at that point have believed he was in custody to the degree associated with a formal arrest," and he should have then been given a <u>Miranda</u> warning. (Petition, [Docket No. 1], p. 4, § 12 [attachment].) Petitioner claims that his confession, (or at least some of it), should be suppressed, and his guilty plea should be vacated, because he was not advised of his <u>Miranda</u> rights when he effectively became "in custody."

Petitioner's two habeas corpus claims are somewhat interrelated, because they both arose out of the Schmitz interview, and they both challenge the admissibility of his confession. However, the two claims are separate and distinct; they involve different factual issues and different legal issues. Petitioner's "coercion" claim pertains strictly to the voluntariness of his confession – i.e., whether he chose to confess, or whether he was put into a position that effectively forced him to confess against his will. The coercion claim focuses on the circumstances that induced Petitioner's confession. The <u>Miranda</u> claim, on the other hand, is based on Petitioner's right to be informed of his constitutional rights, (most notably, the right to remain silent and to obtain a lawyer), before being questioned while in police custody. The <u>Miranda</u> claim focuses on when Petitioner was effectively "in

custody," and should have been given a <u>Miranda</u> warning.

The Minnesota Supreme Court carefully considered Petitioner's coercion claim, and discussed and decided that claim on the merits. However, the <u>Miranda</u> claim was <u>not</u> addressed by the State Supreme Court. Respondent contends that Petitioner is not entitled to a writ of habeas corpus on his coercion claim, because the State Supreme Court's resolution of that claim is not contrary to, or an unreasonable application of, the apposite decisions of the United States Supreme Court. Respondent further contends that Petitioner's <u>Miranda</u> claim has been procedurally defaulted, and should not be addressed on the merits here, because that claim was not fairly presented to the Minnesota Supreme Court. This Court agrees with both of Respondent's contentions.

## III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act, ("AEDPA"), prescribes the standards that govern this Court's substantive review of Petitioner's habeas corpus claims. The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district

courts.  The Supreme Court recognized that

> "a state-court decision can be 'contrary to' this Court's clearly established precedent in two ways.  First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."

Id. at 405.

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Id. at 413.

The Court also explained that

> "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.... [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

Id. at 409, 411 (emphasis added).[8]

_____

[8]  A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  In other words, habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the state court evidentiary record.  When reviewing a state court decision, however, "a federal court... presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence."  Lee v. Gammon, 222 F.3d 441, 442 (8th Cir. 2000).  See also 28 U.S.C. § 2254(e)(1).  This aspect of the habeas statute has no direct bearing on the present case, because the trial court's findings of fact have not been challenged by the parties, or questioned by the state appellate courts.

Needless to say, a federal district court is not allowed to conduct its own de novo review of a state prisoner's constitutional claims. Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts. Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in Williams.

## IV. DISCUSSION

### A. Coercion Claim (Ground One)

Petitioner first claims that his confession to Officer Schmitz should be suppressed, and his guilty plea should be vacated, because the confession was not voluntary, but coerced. Petitioner cites several specific factors to support his coercion claim. He contends that Schmitz deliberately deceived him, and caused him to wrongly believe that if he confessed to molesting BP he could (i) avoid going to prison, (ii) retain custody of his children, and (iii) get some form of psychological counseling or treatment. Petitioner contends that these alleged assurances, coupled with inferences of what would happen if he did not confess, (i.e, he would go to jail, lose his children, and get no treatment), effectively precluded a truly voluntary confession. According to Petitioner, Schmitz's promises and implied threats were so coercive that he really had no choice but to confess, regardless of his actual guilt or innocence.

After reviewing the evidentiary record, including a transcript of Petitioner's interview with Officer Schmitz, the trial court judge concluded that Petitioner had indeed been coerced into giving his confession, and that the confession was suppressible because it was not voluntary. The Court of Appeals did not adjudicate Petitioner's coercion claim,

because it found the claim to be waived by Petitioner's guilty plea. The Minnesota Supreme Court overturned the trial court's ruling on the coercion claim, and concluded, as a matter of law, that Petitioner's confession was voluntary.[9] The question now before this Court is whether the Minnesota Supreme Court's resolution of Petitioner's coercion claim is contrary to, or an unreasonable application of, the controlling precedents of the United States Supreme Court.

The parties seem to agree that the U.S. Supreme Court decision that is most relevant to this case is Lynumn v. Illinois, 372 U.S. 528 (1963). The Minnesota Supreme Court considered Petitioner's coercion claim in light of Lynumn, and this Court also finds that Lynumn is the leading case on point.

In Lynumn, the police offered favorable treatment to an accused drug dealer if he would help them apprehend someone else. The drug dealer agreed, and took three police officers with him to the apartment of a woman named "Beatrice." After the drug dealer visited Beatrice alone, he left her apartment and showed the police a package of marijuana that he had purportedly purchased from her. He then returned to Beatrice's apartment, and when she stepped out to meet him, the police physically seized her. The police then took her back into her apartment, and interrogated her. Beatrice initially denied that she had sold the marijuana, but she later confessed that she had done so.

---

[9] It is well-settled, (and the parties do not disagree), that the voluntariness of a confession is a question of law. See Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002), ("[w]hile a state court's resolution of factual issues is entitled to a presumption of correctness, the ultimate determination of whether a confession was voluntary presents a question of law"), cert. denied, 540 U.S. 893 (2003), (citing Simmons v. Bowersox, 235 F.3d 1124, 1130 (8th Cir.), cert. denied, 534 U.S. 924 (2001)). See also Miller v. Fenton, 474 U.S. 104, 116 (1985) ("the dispositive question of the voluntariness of a confession has always had a uniquely legal dimension").

Beatrice's confession was used against her at her trial, and she was convicted. When her case came before the United States Supreme Court, she argued that her confession should have been declared inadmissible, because it was procured by coercion. The Supreme Court agreed, explaining that --

> "It is thus abundantly clear that the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.' These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly 'set her up.' There was no friend or adviser to whom she might turn. She had had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.

> We think it clear that a confession made under such circumstances must be deemed not voluntary, but coerced. That is the teaching of our cases. We have said that the question in each case is whether the defendant's will was overborne at the time he confessed."

372 U.S. at 534.

Thus, Lynumn establishes two elemental principles that are directly applicable here. First, a confession that is "not voluntary, but coerced," is inadmissible. Second, in order to determine whether a confession was voluntary, a court must review the circumstances surrounding the confession, and decide whether "the defendant's will was overborne at the time he confessed." Id. These principles have been further illuminated by subsequent Supreme Court case law.

In Schneckloth v. Bustamonte, 412 U.S. 218 (1973), the Court reiterated that a suspect's confession is not voluntary if "his will has been overborne and his capacity for self-determination critically impaired." Id. at 225. The Court further explained that –

> "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding

circumstances – both <u>the characteristics of the accused</u> and <u>the details of the interrogation</u>.  Some of the factors taken into account have included the youth of the accused,... his lack of education,... or his low intelligence,... the lack of any advice to the accused of his constitutional rights,... the length of detention,... the repeated and prolonged nature of the questioning,... and the use of physical punishment such as the deprivation of food or sleep."

<u>Id</u>. at 226 (citations omitted) (emphasis added).   <u>See also Smith</u>, 311 F.3d at 922 (circumstances to consider when determining whether a confession was voluntary or coerced "may include, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition").

As previously mentioned, the Minnesota Supreme Court expressly acknowledged that Petitioner's coercion claim was governed by <u>Lynumn</u> and its progeny.   The State Court's recitation of the controlling legal principles bears repeating here:

"We look at the totality of the circumstances to determine whether a confession was voluntary.... [Citation omitted.]  Relevant factors include the defendant's age, maturity, intelligence, education, and experience; 'the ability of the defendant to comprehend; the lack of or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; whether the defendant was deprived of any physical needs; and whether the defendant was denied access to friends.'... [Citation omitted.] '[T]he question in each case is whether the defendant's will was overborne at the time he confessed.'... [Citation to <u>Lynumn</u> omitted.]

<u>Farnsworth</u>, 738 N.W.2d at 373.

It is readily apparent that the Minnesota Supreme Court fully recognized, and correctly understood and recited, the legal principles governing Petitioner's coerced confession claim.  However, Petitioner contends that the State Court's ultimate adjudication of his coerced confession claim is both "contrary to," and an "unreasonable application of," the apposite precedential decisions of the United States Supreme Court.

Petitioner first contends that the State Supreme Court's decision is "contrary to" Lynumn, because the facts of his case are "materially indistinguishable" from Lynumn, but the outcome was different. (Petitioner's Memorandum of Law, [Docket No. 8], p. 35.) This argument must be rejected, however, because there are several material differences in the facts of the two cases, which could justify different outcomes.

The petitioner in Lynumn was physically seized, forcibly moved into her apartment, and surrounded by three police officers, (Lynumn, 372 U.S. at 529-30, n. 2), while the Petitioner in this case went by himself to the police station, was questioned by Officer Schmitz alone, and was told he was free to leave. The petitioner in Lynumn "had no previous experience with the criminal law," (id. at 534), while the Petitioner in this case had significant prior experience with law enforcement authorities, and made several statements reflecting his familiarity with the criminal justice system.

Most importantly, in Lynumn, the Supreme Court found that it was "abundantly clear" that the petitioner gave her confession only after the police officers explicitly threatened to take away her "infant children" if she did not confess. (Id.) Furthermore, the police threatened to take away the children's state financial aid, leaving them both parentless and penniless. (Id.)[10] No such direct, dire threats were made by Officer Schmitz in this case.

_____

[10] In Lynumn, the petitioner testified that –

"[The police officers] started telling me I could get 10 years and the children could be taken away, and after I got out they would be taken away and strangers would have them, and if I could cooperate he would see they weren't; and he would recommend leniency and I had better do what they told me if I wanted to see my kids again. The two children are three and four years old. Their father is dead; they live with me. I love my children very much. I have never been arrested for anything in my whole life before. I did not know how much power a policeman had in a recommendation to the

Thus, the Court rejects Petitioner's contention that the facts in the case at bar are "materially indistinguishable" from <u>Lynumn</u>, and, accordingly, the Court finds that the Minnesota Supreme Court's decision on Petitioner's coercion claim is not "contrary to" <u>Lynumn</u>, (or any other United States Supreme Court decision), for purposes of § 2254(d)(1).

Petitioner further argues that the Minnesota Supreme Court's rejection of his coercion claim is based on an unreasonable application of <u>Lynumn</u>. To substantiate this claim, Petitioner must show that the State Court applied <u>Lynumn</u> to the facts of his case in a way that was "objectively unreasonable." <u>Williams</u>, 529 U.S. at 409. The Court finds that Petitioner is unable to satisfy this arduous requirement.

The Minnesota Supreme Court carefully considered the totality of the circumstances surrounding Petitioner's meeting with Officer Schmitz. The Court began its analysis by pointing out the following:

> "[Petitioner] came to the police station voluntarily, and the interview itself was short – a little over an hour. While [Petitioner] was not informed of his <u>Miranda</u> rights, he was told that he was not under arrest and that he could leave at any time.... [Footnote omitted.] The interview was conducted in Schmitz's office, and although Schmitz was armed, he was not in uniform. [Petitioner] appears to be of normal maturity and average intelligence.

---

State's Attorney or to the Court. I did not know that a Court and a State's Attorney are not bound by a police officer's recommendations. I did not know anything about it. All the officers talked to me about my children and the time I could get for not cooperating. All three officers did. After that conversation I believed that if I cooperated with them and answered the questions the way they wanted me to answer, I believed that I would not be prosecuted. They had said I had better say what they wanted me to, or I would lose the kids. I said I would say anything they wanted me to say."

Lynumn, 372 U.S. at 531.

Although [Petitioner's] education is limited to a GED, he has work experience that includes employment in a supervisory capacity. [Petitioner] has previous experience with the criminal justice system, having been convicted of criminal sexual conduct in the third degree in 1994, and he was also accused of assault in 1996. Given [Petitioner's] repeated mention of his fear of going to jail and losing custody of his children, we reasonably infer that [Petitioner] understood the consequences of his statements to the police and comprehended the gravity of the situation. Additionally, when Schmitz tried to take [Petitioner's] formal statement, [Petitioner] refused, specifically stating that he had a right to remain silent and that everything he said could be used against him, which further emphasizes [Petitioner's] understanding of the situation."

Farnsworth, 738 N.W.2d at 373-74.

Petitioner downplays the significance of the factors cited in the foregoing passage of the State Court's decision, arguing that these factors "did not come even close to negating the overbearing and coercive tactics Schmitz used" when questioning Petitioner. (Petitioner's Memorandum of Law, [Docket No. 8], p. 42.) However, all of these factors are relevant to Petitioner's coercion claim, and it was entirely reasonable for the State Court to consider them.

Petitioner further argues that the State Court did not just overemphasize the factors cited in its opinion, but also misconstrued those factors. He contends that he did not come to the police station voluntarily, but only because he thought he had to appear in order to get his children back. (Id., pp. 42-43.) He also contends that his past experience with the criminal justice system is not significant, because that experience did not make him any less susceptible to coercion. (Id., p. 43.) While Petitioner acknowledges that he was told he could leave the police station at any time, he argues that this was an insignificant factor, because he was not reminded he could leave as the interview progressed. (Id., p. 43.) Petitioner also acknowledges that he independently expressed concerns about going to jail

and losing his children, but he contends that those concerns do not preclude the possibility that he was coerced into making false admissions. (Id., p. 44.)

Petitioner's arguments are not irrational, and his perspective on the interview is not wholly unreasonable. But at the same time, it was not "objectively unreasonable" for the Minnesota Supreme Court to find that Petitioner's coercion claim was undermined by the factors it cited – i.e., (a) he was not apprehended and escorted to the police station, but went there on his own, (b) he was told he could leave any time, (c) he had prior experience with the criminal justice system, and (d) he knew that molesting BP could cause him to go to jail and lose his children.

The Minnesota Supreme Court also carefully considered the interaction between Schmitz and Petitioner during the interview at the police station. The Court acknowledged that Schmitz used an "empathetic approach," by offering Petitioner "help" in the form of treatment, and by sympathizing with Petitioner's concerns about losing his children. Petitioner claims that this approach deceived him, and gave him the false impression that "if he cooperated he could get help and have his kids." (Petitioner's Memorandum of Law, [Docket No. 8], p. 46.) However, Schmitz did not make any specific quid pro quo promises that Petitioner could avoid prosecution and keep his children by confessing. Furthermore, as the State Court correctly pointed out, Petitioner obviously knew that he could go to jail and lose his children based solely on his initial admissions about touching BP while he was masturbating, and thus it makes little sense that Petitioner "would proceed to confess to acts of penetration on the belief that confessing to those more incriminating acts would somehow permit him to retain custody." Farnsworth, 738 N.W.2d at 375.

Schmitz arguably did "promise" that Petitioner would "get help," but that vague assurance was properly discounted by the Minnesota Supreme Court. See Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir.) ("[a]lthough a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se"), cert. denied, 534 U.S. 924 (2001); see also Smith, 311 F.3d at 922 (while "[i]t is improper for a police officer to obtain a confession through an express or implied promise of leniency... such a promise will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self determination"). Moreover, Petitioner's candid admission that he needed help greatly undermines his assertion that he was forced to confess to a supposedly non-existent crime.

Petitioner also contests the Minnesota Supreme Court's interpretation of his attempt to recant his confession. According to the Court, the attempted recantation shows that Petitioner understood his rights, and the ramifications of his statements to Officer Schmitz. Petitioner sees it differently. He contends that he "recanted because he realized that Schmitz had gotten him to falsely admit [to] sexually abusing B.P. by lying to him." (Petitioner's Memorandum of Law, [Docket No. 8], pp. 44-45.) Petitioner's interpretation of the recantation is not wholly unreasonable, but the inference drawn by the Minnesota Supreme Court is not unreasonable either.

After carefully considering all of Petitioner's arguments, the Court finds that he cannot satisfy the burden imposed by § 2254(d)(1). The interrogation procedures that were used in this case cannot be commended, and reasonable jurists probably could find them to be improperly coercive. Indeed, the trial court judge determined that Petitioner's

confession was involuntary, and two dissenting justices of the Minnesota Supreme Court evidently agreed with that determination. <u>Farnsworth</u>, 738 N.W.2d at 376 (Hanson, J., dissenting) ("the decision of the district court... was not clearly erroneous"). However, the Minnesota Supreme Court correctly recognized the apposite constitutional principles, and diligently applied those principles to the facts of this case. That Court carefully explained why it concluded, after examining the totality of the circumstances, that Petitioner's will was not overborne, and his confession was not involuntary. Reasonable jurists might disagree with the State Court's conclusion, but that conclusion was not "objectively unreasonable" for purposes of § 2254(d)(1).

### B. Miranda Claim (Ground Two)

In Petitioner's second ground for relief, he claims that his confession should be suppressed, and his guilty plea should be vacated, because he was not advised of his <u>Miranda</u> rights before he confessed. Petitioner previously raised this claim in his motion to withdraw his guilty plea, but the trial court apparently found no need to decide the claim, because Petitioner's confession was found to be suppressible based solely on his coercion argument. Petitioner also raised his <u>Miranda</u> claim in the Minnesota Court of Appeals, but the claim was not addressed there, because the Court of Appeals found that Petitioner's guilty plea effectively waived <u>all</u> challenges to his confession.

Respondent now contends that Petitioner did <u>not</u> present his <u>Miranda</u> claim to the Minnesota Supreme Court, and the claim is therefore procedurally defaulted. The Court agrees.

A federal constitutional claim is reviewable in a § 2254 habeas corpus proceeding only if that claim was first fairly presented to, and decided on the merits by, <u>the highest</u>

available state court.  The United States Supreme Court has explained this requirement as follows:

> "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'... [Citations omitted.]  To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. [Citations omitted]."

Baldwin v. Reese, 541 U.S. 27, 29 (2004).  See also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("[b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts,... state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process").  Thus, in Minnesota, a state prisoner must fairly present his federal constitutional claims to the Minnesota Supreme Court in order to satisfy the exhaustion of state court remedies requirement.

A state prisoner seeking federal habeas relief is not required to have spelled out every nuance of his federal constitutional claims to the state courts, but he must clearly bring his constitutional claims to the attention of the state courts.  "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."  Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam).  "'A claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas

petition.'" <u>Wemark v. Iowa</u>, 322 F.3d 1018, 1021 (8th Cir.), <u>cert</u>. <u>denied</u>, 540 U.S. 870 (2003), quoting <u>Joubert v. Hopkins</u>, 75 F.3d 1232, 1240 (8th Cir.1996). "It is not enough that all the facts necessary to support the federal claim were before the state courts,... or that a somewhat similar state-law claim was made...[;] [i]n addition, the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." <u>Anderson v. Harless</u>, 459 U.S. 4, 6, (1982) (citations omitted).

Again, to satisfy the exhaustion of state court remedies requirement, a habeas petitioner's federal constitutional claims must be fairly presented to the highest available state court. <u>Baldwin</u> clearly teaches that it is not enough to raise a federal constitutional claim in the lower state courts. 541 U.S. at 31-32. In order to fully and properly exhaust his state court remedies for a particular claim, a state prisoner must raise that claim, and clearly present the federal constitutional basis for that claim, in his petition for review in the highest state court. A habeas claim that has not been fairly presented to the highest available state court is an unexhausted claim, and cannot be entertained in federal court.

"When a state court remedy is available for a state prisoner's unexhausted claim, the federal habeas court must defer action until the claim is exhausted, either by dismissing the federal petition without prejudice or by using the 'stay and abeyance' procedure described in <u>Rhines v. Weber</u>, [544 U.S. 269]... (2005)." <u>Armstrong v. Iowa</u>, 418 F.3d 924, 926 (8th Cir. 2005), <u>cert</u>. <u>denied</u>, 546 U.S. 1179 (2006). However, when a prisoner has not exhausted his state court remedies for some particular claim, and state procedural rules preclude any further attempts to satisfy the exhaustion requirement as to that claim, then the claim is not truly "unexhausted," but rather, it has been "procedurally defaulted." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); <u>McCall v. Benson</u>, 114 F.3d 754, 757

(8th Cir. 1997). In other words, if there is still a state court remedy available, a previously unraised habeas claim is "unexhausted," but if there is no state court remedy still available, then the claim is "procedurally defaulted." See Armstrong, 418 F.3d at 926 ("if no state court remedy is available for the unexhausted claim – that is, if resort to the state courts would be futile – then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim...'") (quoting Gray v. Netherland, 518 U.S. 152, 162 (1996). See also Middleton v. Roper, 455 F.3d 838, 855 (8th Cir. 2006) ("'If a prisoner has not presented his habeas claims to the state court, the claims are defaulted if a state procedural rule precludes him from raising the issues now.'"), cert. denied, 549 U.S. 1134 (2007), quoting Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir.) (en banc), cert. denied, 517 U.S. 1215 (1996).

A claim that has been procedurally defaulted will not be entertained in a federal habeas corpus proceeding, unless the petitioner has shown "cause and prejudice" to excuse his procedural default, or, in the alternative, that there would be a "fundamental miscarriage of justice" if the federal court declined to consider the claim. Coleman, 501 U.S. at 750.[11] The rules governing procedural default have been summarized by the Supreme Court as follows:

---

[11] The "fundamental miscarriage of justice" exception, (to overcome a procedural default), is available only upon a "showing, based on new evidence, that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Brownlow v. Groose, 66 F.3d 997, 999 (8th Cir. 1995), cert. denied, 516 U.S. 1161 (1996), quoting Schlup v. Delo, 513 U.S. 298, 327 (1995), (emphasis added). In other words, a petitioner cannot simply point to errors that allegedly occurred during the course of his criminal prosecution; he must instead offer some new evidence which affirmatively demonstrates that he is, in fact, innocent of the crime for which he was convicted.

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violations of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice".

Id.

In this case, Petitioner claims that he did fairly present his Miranda claim to the Minnesota Supreme Court, because his supplemental brief to that Court included the following two sentences:

"Furthermore, when [Petitioner] began making admissions, it was reasonable for him to assume he was no longer free to leave, and he so testified. [Citation to state court record omitted.] Also, the absence of a Miranda warning at any point made it less likely that once [Petitioner] began making admissions that he believed he could leave. See, State v. Champion, 533 N.W.2d 40, 43 (Minn. 1995)."

(Petitioner's Memorandum of Law, [Docket No. 8], p. 48, citing Appellant's Supplemental Brief in the Minn. S. Ct., pp. 17-18.)

This Court finds that the two sentences quoted above did not fairly present Petitioner's current Miranda claim to the Minnesota Supreme Court. These two sentences were intended to bolster Petitioner's coercion claim – not to raise an entirely new and different claim. Petitioner was attempting to show that his confession was coerced, because he had been compelled to come to the police station, and he was not really free to walk out of his interview with Officer Schmitz, even though he had been told he was free to leave at any time. Petitioner did not contend that the absence of a Miranda warning was a separate and independent reason to suppress his confession; he contended that the absence of a Miranda warning made him feel less free to leave the interview, which vitiated the voluntariness of his confession.

Petitioner's citation to <u>State v. Champion</u>, placed as it was in the context of his coercion argument, did not notify the Minnesota Supreme Court that Petitioner was raising an entirely new and independent ground for relief based on <u>Miranda</u>. The citation to <u>Champion</u> was intended to support the preceding sentence in Petitioner's brief, and, as just discussed above, that preceding sentence was part of Petitioner's coercion argument. It is true that <u>Champion</u> refers to <u>Miranda</u>, but given the context in which Petitioner cited <u>Champion</u>, the State Supreme Court could not have deduced that the citation to <u>Champion</u>, by itself, was (supposedly) intended to raise an entirely new federal constitutional challenge to Petitioner's confession, which was separate and distinct from his coercion claim.

Furthermore, the Minnesota Supreme Court specifically noted that Petitioner "appears to have abandoned any argument regarding the absence of a <u>Miranda</u> warning." <u>Farnsworth</u>, 738 N.W.2d at 373, n. 7. This clearly shows that this is <u>not</u> a case in which the State Court overlooked a claim, or declined to address a federal constitutional claim that was plainly raised. <u>Cf</u>. <u>Dye v. Hofbauer</u>, 546 U.S. 1, 3, (2005) ("[f]ailure of a state appellate court to mention a federal claim does not mean the claim was not presented to it"). In this case, the Minnesota Supreme Court evidently searched for a <u>Miranda</u> claim, (recognizing that such a claim had been raised below), but could not find it, and thus concluded that the claim must have been "abandoned." The Minnesota Supreme Court's inability to locate a <u>Miranda</u> claim in Petitioner's briefing, (even after looking for it, apparently), confirms that Petitioner's current <u>Miranda</u> claim, (Ground Two of his habeas corpus petition), was not fairly presented to that Court. In sum, Petitioner did not exhaust his current <u>Miranda</u> claim, because he did not give the Minnesota Supreme Court a fair opportunity to review that claim. <u>See</u> <u>Abdi v. Hatch</u>, 450 F.3d 334, 338 (8th Cir.) ("[t]o preserve a claim for relief, 'a

habeas petitioner must have raised both the factual and legal bases, of his claim to the state court,... and afforded that court a fair opportunity to review its merits") (citations omitted), <u>cert</u>. <u>denied</u>, 549 U.S. 1036 (2006).

The Court also finds that, at this late date, the state courts would no longer entertain the <u>Miranda</u> claim raised in the current habeas petition. Respondent has suggested that Petitioner could have raised the claim in a motion for rehearing when his case was previously before the Minnesota Supreme Court, or he could have filed a direct appeal after he was sentenced in February 2008. However, Petitioner did not pursue either of those avenues, and it is undoubtedly too late to do so now. Moreover, neither Petitioner nor Respondent has suggested that there is any other state court remedy that is still available for Petitioner's <u>Miranda</u> claim.[12] Therefore, Petitioner's <u>Miranda</u> claim is not merely "unexhausted," it is procedurally defaulted.

The only remaining issue to be resolved is whether Petitioner has established cause and prejudice, or a "fundamental miscarriage of justice," to excuse his procedural default. Petitioner has not attempted to excuse his procedural default, and the Court can find no grounds for doing so.

In order to satisfy the "cause" requirement, Petitioner would have to show that some

---

[12]  Petitioner might have been able to raise his <u>Miranda</u> claim in a state post-conviction motion brought under Minn.Stat. § 590.01. However, it is questionable whether the claim would have been entertained in that context, because Minnesota courts normally will not consider a post-conviction claim that could have been raised in an earlier appeal. <u>See</u> <u>McCall</u>, 114 F.3d at 757 ("Minnesota law provides that once the petitioner has directly appealed his sentence 'all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief'"). Furthermore, Minnesota state post-conviction motions are subject to a two-year statute of limitations, (<u>see</u> Minn.Stat. § 590.01, subd. 4), and that limitations period apparently has expired in Petitioner's case.

external impediment prevented him from presenting his <u>Miranda</u> claim to the Minnesota Supreme Court in a timely and procedurally proper manner. <u>Coleman</u>, 501 U.S. at 753 ("'cause' under the cause and prejudice test is something <u>external</u> to the petitioner, something that cannot fairly be attributed to him... [f]or example, 'a showing that the factual or legal basis for a claim was not reasonably available... or that some interference by officials made compliance impracticable'"), (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)) (emphasis in the original). Petitioner has made no effort to show any legally sufficient cause to excuse his procedural default, and the Court cannot independently identify any such cause.

Because Petitioner has failed to satisfy the cause component of the cause and prejudice requirement, it is unnecessary to address the prejudice component. <u>Ashker v. Class</u>, 152 F.3d 863, 871 (8th Cir. 1998) (when petitioner "has not shown adequate cause to overcome the procedural bar... we need not consider the issue of actual prejudice"); <u>Sweet v. Delo</u>, 125 F.3d 1144, 1151 (8th Cir. 1997), <u>cert</u>. <u>denied</u>, 523 U.S. 1010 (1998) (same). Petitioner also does not qualify for the "fundamental miscarriage of justice" or "actual innocence" exception, (<u>see</u> fn. 11, <u>supra</u>), because he has not presented any new and previously undiscoverable evidence, which provides clear and convincing proof that he is, in fact, innocent of the crime for which he was convicted. <u>See</u> <u>Cox v. Burger</u>, 398 F.3d 1025, 1031 (8th Cir.) (successful demonstrations of actual innocence are "rare and limited," because the actual innocence exception is "permitted only for 'truly persuasive demonstrations of actual innocence,' based on reliable new evidence which shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence'"), <u>cert</u>. <u>denied</u>, 546 U.S. 844 (2005) (citations omitted). Therefore,

Petitioner's procedural default of his <u>Miranda</u> claim cannot be excused, and that claim cannot be adjudicated here.

## V.  CONCLUSION

For the reasons discussed above, the Court concludes that Petitioner cannot be granted a writ of habeas corpus on either of the two claims for relief presented in his current habeas corpus petition.  His coercion claim, (Ground One), must be denied, because he is unable to show that the Minnesota Supreme Court's resolution of that claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," as required by § 2254(d)(1).  Petitioner's <u>Miranda</u> claim, (Ground Two), must be denied because it has been procedurally defaulted.  The Court will therefore recommend that Petitioner's habeas corpus petition be denied, and that this action be dismissed with prejudice.

## VI.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.  Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254, (Docket No. 1), be **DENIED**; and

2.  This action be **DISMISSED WITH PREJUDICE**.

Dated: March 2, 2010

 <i>s/ Jeffrey J. Keyes</i>
JEFFREY J. KEYES
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **<u>March 16, 2010</u>**, a writing which

specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.